UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

TARIQ ALAMGIR,

                       Petitioner,

       v.

UNITED STATES OF AMERICA,

                       Respondent.

**MEMORANDUM & ORDER**
20-CV-215 (MKB)

-------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

Petitioner Tariq Alamgir filed a petition for a writ of error *coram nobis* on January 13,

2020, pursuant to 28 U.S.C. § 1651(a), seeking to vacate his guilty plea to making a false

statement to a federal official in violation of 18 U.S.C. § 1001(a).  (*See generally* Pet., Docket

Entry No. 1; Pet'r's Mem. in Supp. of Pet. ("Pet'r's Mem."), Docket Entry No. 1-8.)  Petitioner

claims that counsel was ineffective for (1) failing to advise him of any immigration

consequences of the plea, and (2) failing to adequately acknowledge a "clear conflict" in jointly

representing Petitioner and his co-defendant throughout the proceedings.  (Pet'r's Mem. 2.)  The

government opposes the petition on the bases that the petition is untimely and that the claims are

without merit.  (*See* Gov't Letter in Opp'n ("Gov't Opp'n"), Docket Entry No. 6.)

For the reasons set forth below, the Court denies the petition in its entirety.

**I.  Background**

    **a.  Petitioner, his brother and the relevant charges against them**

Petitioner and his co-defendant who is also his brother, Nasir Bhatti, are natives of

Pakistan.  (Pet'r's Decl. ¶¶ 1, 4, Docket Entry No. 1-7.)  At his brother's urging, Petitioner

immigrated to the United States in 1992 to join Bhatti[1] and aid him in developing a construction business.  (*Id.* ¶¶ 6, 8.)  Petitioner became a Legal Permanent Resident in 1997 and continued to work alongside his brother.  (*Id.* ¶¶ 6–8, 12.)

In October of 2003, Nasir Bhatti incorporated Metla Construction, Inc. ("Metla"), and named Petitioner the manager.  (Tr. of Pleadings for Tariq Alamgir and Nasir Bhatti ("Tr.") 20:15–23, Docket Entry No. 1-3.)  Bhatti owned Metla, and together the brothers oversaw day-to-day operations.  (Tr. 20:15–23.)  Metla primarily completed waterproofing and roofing work for multiunit residential buildings around New York City.  (Tr. 20:24–21:2.)  On June 1, 2005, an employee of Metla fell to his death at a worksite in Brooklyn, New York after the suspended scaffolding from which he was working became partially disconnected from the apartment building.  (Tr. 21:3–11.)  The employee did not have any required fall protection.  (Tr. 21:12–19.)  As a result, compliance officers from the Occupational Safety and Health Administration ("OSHA") opened an investigation into the incident.  (Tr. 21:7–8.)

On June 23, 2005, an OSHA compliance officer interviewed Petitioner.  He knowingly gave the investigators an alias, "Alex Metla," and falsely represented to the investigators that he did not know any persons named Tariq Alamgir or Nasir Bhatti — who are in fact, Petitioner and his brother.  (Tr. 13:6–19; 38:16–21.)  Both men were arrested and charged in the Eastern District of New York.  Petitioner waived indictment and pleaded guilty to an information charging him with making a false statement to a government official, in violation of 18 U.S.C. § 1001(a).  (Tr. 12:18–14:20.)  The same information charged Bhatti, as owner of Metla, with violating OSHA regulation 29 C.F.R. § 1926.501(b)(1), for knowingly and willfully failing to

---

[1] Bhatti moved to the United States two years prior.  (Pet'r's Decl. ¶ 6.)

provide fall protection for Metla employees, which resulted in the death of an employee.  (Tr. 20:4–21:19; *see* Information, Docket Entry No. 33 in 06-CR-701.)

### b.  Guilty plea and sentencing

Petitioner and his brother pleaded guilty before the Honorable Nina Gershon on December 6, 2006 to their respective charges.  (Tr. 31:22–40:11.)  They were jointly represented by attorneys Jerry D. Bernstein and Marc Rothenberg but each defendant had his own Punjabi interpreter.  (Tr. 2:7–3:6.)  Prior to taking the pleas, the Court conducted a hearing pursuant to *United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982), to address the desire of Petitioner and his brother to waive any possible conflict in representation.  In advance of the *Curcio* hearing, Petitioner and his brother separately met with independent counsel, Bruce Maffeo, and Petitioner acknowledged that he had time to consult with the independent counsel prior to making his waiver decision.  (Tr. 3:9–4:21.)  Counsel also wrote a letter to the Court detailing the meetings with independent counsel and confirming that Petitioner and Bhatti both wished to waive any potential conflicts in representation.  (Tr. 3:9–4:21.)  Petitioner affirmed that he read and understood the letter, agreeing that its contents were accurate.  (Tr. 3:9–4:21.)  In addition, the Court engaged in the following colloquy with the parties:

> COURT:  First, I want to remind each of you that once you waive your right to an independent counsel, you will not be permitted to complain about any potential conflict of interest that becomes a real conflict of interest.  Do you understand that?
>
> BHATTI:  That's fine.
>
> COURT:  Do you understand that?
>
> ALAMGIR:  Yes.
>
> COURT:  In other words, you can't change your mind after you plead guilty and after you are sentenced, even if you are dissatisfied with the sentence.  Do you understand that?

3

> BHATTI:      Yes.
>
> ALAMGIR:   Yes.

(Tr. 5:12–25.)  The Court also made clear to Petitioner and his brother that there were potential

conflicts of interest between them and explained the arguments that their attorneys could not

make as a result of joint representation.  Both indicated that they understood the consequences of

proceeding with the waiver:

> COURT:      . . . [T]he fact that [the government] didn't offer a
> cooperation agreement to one of you does not mean that – and your
> attorney – an independent attorney, could not have sought a
> cooperation agreement.  Do you understand?
>
> BHATTI:      Yes.
>
> COURT:      Do you understand that, Mr. Alamgir?
>
> ALAMGIR:   Yes.
>
> COURT:      I can't know whether or not, if an attorney for one of
> you had sought a cooperation agreement, whether the government
> might have agreed to that.  Do you understand that?
>
> BHATTI:      Yes, ma'am.
>
> ALAMGIR:   Yes.
>
> COURT:      If there were a cooperation agreement, and one of
> you cooperated against the other, the cooperating person could
> expect more leniency at sentencing than might otherwise be
> available to you.  Do you understand that?
>
> BHATTI:      Yes, Your Honor.
>
> COURT:      Do you understand that, Mr. Alamgir?
>
> ALAMGIR:   Yes.
>
> ***
>
> COURT:      I think it is very important that each of you
> understand that there remain potential conflicts of interest between
> the two of you with respect to these charges, and that there are
> arguments that an independent attorney could make which your

> attorneys, Mr. Bernstein and Mr. Rothenberg, could not make.  Do
> you understand?
>
> ALAMGIR:   Yes.
>
> BHATTI:    Yes.

(Tr. 6:21–8:17.)  The Court then asked Petitioner (and his brother) to explain to her in their own

words what they understood the potential conflict to be:

> COURT:      At this time I would like to ask you to please explain
> to me, in your own words, what you understand the potential
> conflicts are that you are prepared to give up.
>
> ***
>
> ALAMGIR:   I have understood this much.  If I have a separate
> individual attorney for myself, and the attorney who explained the
> conflict of interest that might be, by the name of Bruce [Maffeo], he
> explained the potential conflict of interest issue.  Despite that, I still
> go along with the -- with our current attorney.  I think -- I think one
> attorney for both of us is just fine.
>
> COURT:      All right.  What I would like to know is if you could
> identify for me, in your own words, what the potential conflict of
> interest is.
>
> ALAMGIR:   I can put it this way.  That if I have my own personal
> attorney, then that attorney is interested in looking after my interest
> and not anybody else's.  He won't do any -- he won't have any
> interest for my brother.
>
> COURT:      All right.  You understand that if you share the same
> attorney, you won't have such an attorney who has only your interest
> at heart?
>
> ALAMGIR:   I understand that.

(Tr. 8:18–11:11.)  After further conversation with counsel and additional colloquy with

Petitioner and his brother, the Court accepted the conflict waivers as knowing and voluntary.

(Tr. 11:21–22.)

During the plea colloquy, Petitioner stated that he had been communicating with his

attorneys in English and that he was able to understand them.  (Tr. 18:7–12.)  Petitioner

acknowledged that he had discussed the case with counsel and was satisfied with their representation, and affirmed that he understood both the nature of the proceedings against him and the consequences of pleading guilty:[2]

> COURT:      You understand what's going on here?
>
> ALAMGIR:   Yes.
>
> COURT:      Mr. Bernstein, do you have any doubts as to your two client[s'] competence?
>
> BERNSTEIN: No, Your Honor.
>
> COURT:      I am going to ask [Petitioner] now, have you had enough time to discuss your case with your attorney?
>
> ALAMGIR:   Yes.
>
> COURT:      Are you satisfied with him as your attorney?
>
> ALAMGIR:   Yes.
>
> COURT:      Did you discuss the charges in the information with your attorney?
>
> ALAMGIR:   Yes.
>
> ***
>
> COURT:      Mr. Alamgir, do you understand the nature of the charge to which you are offering to plead guilty?
>
> ALAMGIR:   Yes.

(Tr. 19:9–21:22.) The Court also confirmed that Petitioner understood everything in the plea agreement:

> COURT:      Would you look at that agreement, please?  Does it have your signature on it?
>
> ALAMGIR:   Yes.
>
> COURT:      Is that your signature?

---

[2] For ease of review, the Court omits intervening statements by Petitioner's brother.

> ALAMGIR:    Yes.
>
> COURT:    Did you in fact sign the agreement?
>
> ALAMGIR:    Yes.
>
> COURT:    Did you discuss the plea agreement with your attorney before you signed?
>
> ALAMGIR:    Yes.
>
> COURT:    Do you understand everything in the plea agreement?
>
> ALAMGIR:    Yes.
>
> COURT:    Do you agree to it?
>
> ALAMGIR:    Yes.

(Tr. 23:21–24:18.)  As a non-citizen, the Court further advised Petitioner that he faced possible deportation because of his plea to the felony charge:

> COURT:    In addition, I understand that you are not a citizen and that you therefore face possible deportation or removal from this country on the basis of the charge against you.  Do you understand that?
>
> ALAMGIR:    Yes.

(Tr. 26:19–24.)  Petitioner further acknowledged that he was pleading guilty voluntarily and of his own free will, that no promises were made in exchange for his plea, and that he was not threatened or otherwise forced to plead guilty.  (Tr. 37:20–38:11.)  The Court accepted the plea based on the facts as stated in the information, and as articulated by petitioner during allocution. (Tr. 40:5–11.)

Petitioner's plea agreement also included a waiver of appellate rights.  Petitioner agreed that he would not "file an appeal or otherwise challenge the conviction or sentence in the event that the Court impose[d] a term of imprisonment of six months or less."  (Tr. 28:9–16.)

7

At his sentencing on July 24, 2007, Petitioner had the use of an interpreter. (Tr. of Sentence for Tariq Alamgir and Nasir Bhatti ("Sent'g Tr.") 2:12–16, Docket Entry No. 1-4.) The Court sentenced Petitioner to six months of incarceration followed by three years of supervised release. (Sent'g Tr. 19:9–20:4.) The Court also ordered him to pay a $126,000 penalty to OSHA, $100,000 in restitution, and a $100 special assessment.[3] (Sent'g Tr. 19:12–20:18.)

Petitioner neither directly appealed his conviction nor raised a collateral challenge in a 28 U.S.C. § 2255 petition.

### c. Immigration consequences and *Coram Nobis* petition

Petitioner served his sentence and contends that he has since traveled back and forth to Pakistan "on at least five occasions" with no issue gaining re-entry to the United States. (Pet'r's Decl. ¶ 32.) However, on a return trip from Pakistan in June of 2012, agents stopped him at John F. Kennedy International Airport due to the Department of Homeland Security's recently issued Notice to Appear, informing Petitioner of the removal proceedings initiated against him. (*Id.* ¶ 33.) Petitioner subsequently sought the assistance of immigration counsel, and with counsel, has been litigating the deportation proceeding since 2012. (*Id.* ¶ 34.)

Petitioner contends that in the summer of 2019, immigration counsel advised him that it would be necessary for Petitioner to pursue a collateral challenge of his conviction under 18 U.S.C. § 1001 because his conviction constituted an "aggravated felony" which negates any possibility of cancelling his pending removal. (Pet'r's Decl. ¶ 35; Pet'r's Mem. 1.) *See* 8 U.S.C. § 1101(a)(43) (defining "aggregated felony); 8 U.S.C. §§ 1227(a)(2)(A)(iii), 1228(c) ("Any alien

---

[3] The Court sentenced Bhatti to six months of incarceration, one year of supervised release, and ordered him jointly and severally liable for payment of the OSHA penalty. (Sent'g Tr. 19:9–20:20.)

who is convicted of an aggravated felony at any time after admission is deportable," and "an aggravated felony shall be conclusively presumed to be [a] deportable" offense.)  Petitioner then retained counsel, who filed the instant Petition for Writ of Error *Coram Nobis* on January 13, 2020, over thirteen years after Petitioner's guilty plea.  Petitioner asserts that his conviction should be vacated on the grounds that counsel was ineffective for failing to advise him that there would be any immigration consequences if he pled guilty and, separately, that counsel failed to acknowledge "a clear conflict in representation of [P]etitioner" while also representing his brother/co-defendant, Bhatti.  (Pet'r's Mem. 2.)

## II.  Discussion

### a.  Standard of review

A writ of error *coram nobis* is not a substitute for appeal, but rather an "extraordinary remedy" whose relief is strictly limited to those cases in which errors "of the most fundamental character have rendered the proceeding itself irregular and invalid."  *United States v. Abakporo*, No. 21-CR-2650, 2022 WL 17684583, at *1 (2d Cir. Dec. 15, 2022) (first quoting *Kovacs v. United States*, 744 F.3d 44, 49 (2d Cir. 2014); then quoting *Foont v. United States*, 93 F.3d 76, 78 (2d Cir. 1996)); *see also United States v. Morgan*, 346 U.S. 502, 511–12 (1954) (same); *Martinez v. United States*, 840 F. App'x 660, 661 (2d Cir. 2021) ("The writ serves as 'a remedy of last resort.'" (quoting *United States v. Rutigliano*, 887 F.3d 98, 108 (2d Cir. 2018))).  The Court may issue a writ of error *coram nobis* pursuant to the All Writs Act, 28 U.S.C. § 1651(a), only where "extraordinary circumstances are present."  *Nicks v. United States*, 955 F.2d 161, 167 (2d Cir. 1992) (citation omitted); *see* 28 U.S.C. § 1651(a) (granting all courts established by Act of Congress the power to issue "writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law").  The proceedings leading to the

petitioner's conviction are presumed to be correct, and "the burden rests on the accused to show

otherwise." *Morgan,* 346 U.S. at 512; *see also Nicks,* 955 F.2d at 167 (same).

      "To secure coram nobis relief, a petitioner must establish that '(1) there are circumstances

compelling such action to achieve justice, (2) sound reasons exist for failure to seek appropriate

earlier relief, and (3) the petitioner continues to suffer legal consequences from his conviction

that may be remedied by granting of the writ.'" *Martinez*, 840 F. App'x at 661 (quoting

*Rutigliano*, 887 F.3d at 108.)

### b. Appellate waiver

      While not addressed by the parties, the Court finds it necessary to discuss whether

Petitioner's waiver of appellate rights bars the instant petition.  For the reasons discussed below,

the Court finds that it does not.

      An appellate waiver made "knowingly, voluntarily, and competently" is generally

enforceable. *United States v. Bilal*, 941 F. Supp. 2d 397, 401 (S.D.N.Y. 2013) (quoting *United

States v. Riggi*, 649 F.3d 143, 147 (2d Cir. 2011)).  Such appeal waivers apply to attempts to

collaterally attack sentences through writs of error *coram nobis. See United States v. Sanchez*,

No. 03-CR-965, 2010 WL 5222131, *2 (S.D.N.Y. Dec. 22, 2010) (denying writ of *coram nobis*

due to appeal waiver in plea agreement).  The Second Circuit has held, however, that a petitioner

may seek review of a sentence in certain situations, notwithstanding the existence of a waiver

pursuant to a plea agreement, including when a claim of ineffective assistance "calls into

question the legitimacy of the waiver." *Awan v. United States*, No. 09-CV-0359, 2009 WL

3245884, *3 (E.D.N.Y. Sept. 30, 2009) (citation omitted); *United States v. Jude*, Nos. 15-CR-

355, 17-CV-5246, 2019 WL 3500284, *2 (S.D.N.Y. Aug. 1, 2019) (holding that appellate and

collateral attack waivers may be set aside when petitioner challenges "the constitutionality of the process by which he waived those rights" (citations omitted)).

Petitioner agreed to "not file an appeal or otherwise challenge the conviction or a sentence [if] the Court impose[d] a term of imprisonment of six months or less." (Tr. 28:9–16.) The plea colloquy indicates that Petitioner understood the potential consequences of his waiver. *See United States v. Hernandez*, 242 F.3d 110, 112 (2d Cir. 2001) (holding that courts may rely on "the defendant's sworn statements, made in open court . . ., that he understood . . . that he was waiving his right to appeal a sentence below [the stipulated maximum sentence]"). Because the Court imposed a sentence of six months of incarceration, Petitioner is barred from collaterally challenging matters not related to the constitutionality of the process by which he waived his rights. *Cf. Northover v. United States*, No. 16-CV-6086, 2019 WL 6173704, *3 (S.D.N.Y. Nov. 19, 2019) ("[A] claim of ineffective assistance is waived when it relates to counsel's performance at the sentence." (citing *United States v. Djelvic*, 161 F.3d 104, 107 (2d Cir. 1998))).

Petitioner can nevertheless challenge the voluntariness of his guilty plea on the basis of ineffective representation at the plea proceeding. *See United States v. Lloyd*, 901 F.3d 111, 124 (2d Cir. 2018) (explaining that a defendant's "guilty plea [is] invalid and his appeal waiver [is] unenforceable if he prevail[s] on his claim that he received constitutionally ineffective assistance of counsel during his plea proceedings" (citations omitted)). Because both of Petitioner's ineffective assistance of counsel claims stem from counsel's allegedly deficient representation at the guilty plea stage, the Court will address these claims on the merits despite his appellate waiver.

### c.  Merits of Coram Nobis petition

The test for whether a petitioner is entitled to *coram nobis* relief is conjunctive — if he

fails to prove any one prong, the petition must be denied.  *See United States v. Mandanici*, 205

F.3d 519, 524 (2d Cir. 2000) (citing *Fleming v. United States*, 146 F.3d 88, 90 (2d Cir. 1998))

(explaining how petitioner must establish that there are circumstances which compel the need for

relief, sound reasons exist for not raising the claim sooner, and they suffer ongoing legal

consequences which would be remedied by granting relief); *see also Calderon v. United States*,

953 F. Supp. 2d 379, 385 (E.D.N.Y. 2013) (finding that sounds reasons existed for not seeking

appropriate relief earlier and petitioner continued to suffer legal consequences, but denying

*coram nobis* petition because he failed to present circumstances which would compel granting

writ to achieve justice).  Petitioner's ongoing deportation proceeding is a continuing legal

consequence stemming from his 2006 conviction.  *See Kovacs*, 744 F.3d at 49 (explaining that

the petitioner must show that he "continues to suffer legal consequences from his conviction that

may be remedied by granting of the writ" (quoting *Foont*, 93 F.3d at 79)); *Fleming*, 146 F.3d at

90 (discussing justifications for "continuing legal consequence" requirement).  The Court

therefore considers whether Petitioner has shown that there exist both (1) circumstances which

compel granting the petition to achieve justice, and (2) sound reasons for why he did not raise

these claims sooner.  *See Foont*, 93 F.3d at 79.

### i.  Petitioner has not provided compelling circumstances for relief

"The Sixth Amendment right to counsel 'is the right to the effective assistance of

counsel.'"  *Buck v. Davis*, 580 U.S. 100, 118 (2017) (quoting *Strickland v. Washington*, 466 U.S.

668, 686 (1984)).  "A defendant who claims to have been denied effective assistance must show

both that counsel performed deficiently and that counsel's deficient performance caused him

prejudice." *Id.* (citing *Strickland*, 466 U.S. at 687). "[T]he two-part *Strickland v. Washington* test applies to challenges to guilty pleas based on ineffective assistance of counsel." *Hill v. Lockhart*, 474 U.S. 52, 58 (1985). Under *Strickland*, "legal representation violates the Sixth Amendment if it falls 'below an objective standard of reasonableness' as indicated by 'prevailing professional norms,' and the defendant suffers prejudice as a result." *Chaidez v. United States*, 568 U.S. 342, 348 (2013) (quoting *Strickland*, 466 U.S. at 687–88); *see also Premo v. Moore*, 562 U.S. 115, 121 (2011). "To establish ineffective assistance of counsel a defendant must show both deficient performance by counsel and prejudice." *Premo*, 562 U.S. at 121 (internal quotation marks and citation omitted); *see also Chhabra v. United States*, 720 F.3d 395, 406 (2d Cir. 2013) (proving ineffective assistance of counsel requires petitioner to demonstrate both deficient performance and prejudice (citations omitted)).

"Recognizing the 'tempt[ation] for a defendant to second-guess counsel's assistance after conviction or adverse sentence,' . . . counsel should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (first alteration in original) (quoting *Strickland*, 466 U.S. at 690); *see also Bell v. Cone*, 535 U.S. 685, 698 (2002) (stating that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time" (alterations in original) (quoting *Strickland*, 466 U.S. at 689)); *United States v. Rosemond*, 958 F.3d 111, 121 (2d Cir. 2020) (same).

Petitioner primarily argues that he received ineffective assistance of counsel because his counsel ostensibly "never explained to [him that he] could be deported as a consequence of

accepting the plea," and that he never would have accepted the plea had he known.  (Pet'r's Decl. ¶ 21.)  He further argues that counsel also failed to "sufficiently explain[]" to him that joint representation with his brother "created a conflict in [his] defense."  (*Id.* ¶ 20.)  Petitioner fails to establish that counsel was ineffective in either regard.

### 1.  Counsel's actions were not objectively unreasonable

The allegation that plea counsel was deficient for not explaining possible immigration consequences fails on multiple grounds.  As an initial matter, Petitioner's attorneys did not have a legal obligation to notify him of such collateral consequences at the time of his guilty plea. When Petitioner pleaded guilty in 2006, the Supreme Court had not yet held that attorneys must affirmatively warn their clients of the immigration consequences of their potential convictions. *See Padilla v. Kentucky*, 559 U.S. 356, 369 (2010).[4]  However, Second Circuit precedent at the time recognized that "an *affirmative misrepresentation* by counsel as to the deportation consequences of a guilty plea [was] . . . objectively unreasonable."  *United States v. Couto*, 311 F.3d 179, 187–88 (2d Cir. 2002) (emphasis added) (finding ineffective assistance when "counsel affirmatively misled [d]efendant into believing there were things that could be done to avoid deportation"), *abrogated on other grounds by Padilla*, 559 U.S. at 369.  The standard that governs Petitioner's claim then, is whether counsel's actions fell below the duty to not make

---

[4]  Petitioner does not argue that his claim should be analyzed under *Padilla*, but if he had, such an argument would be unavailing.  As the government correctly argues, the Supreme Court decided in 2013 that *Padilla*'s holding announced a new rule and therefore does not apply retroactively.  (Gov't Opp'n 4); *Chaidez v. United States*, 568 U.S. 342, 347, 354 (2013).  New rules are generally inapplicable to cases where, as here, the conviction became final prior to the issuance of the decision announcing said rule.  *See Teague v. Lane*, 489 U.S. 288 (1989); *Clay v. United States*, 537 U.S. 522, 527 (2003) (describing finality as when Supreme Court "affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when time for filing a certiorari petition expires.").  As such, the argument that counsel had an affirmative duty to inform Petitioner that his guilty plea carried a risk of deportation is unavailable.

affirmative misrepresentations regarding the immigration consequences of Petitioner's guilty plea. *Couto*, 311 F.3d at 188; *see also Doe v. United States*, 915 F.3d 905, 910–11 (2d Cir. 2019) (finding counsel acted unreasonably where they wrongly advised client that he "should not have a problem with the immigration authorities and should not face deportation").

Petitioner does not claim, nor does the record suggest, that his counsel made affirmative misrepresentations to him.  Rather, Petitioner claims he "never had any reason to believe" that he would be subject to deportation, faulting his attorneys for never explaining the immigration consequences associated with the plea, and repeatedly stating in his petition for the first time that he did not understand the nature of the proceedings or its consequences due to his inadequate ability to understand English.  (Pet'r's Decl. ¶¶ 17, 21–22, 29, 32–37.)  Petitioner therefore fails to articulate any objectively unreasonable behavior by counsel at the time of the plea and this claim fails for that reason alone.

Moreover, Petitioner's arguments are further belied by the record.  A Punjabi interpreter aided Petitioner throughout his plea and sentencing hearings.  Even so, Petitioner acknowledged at the plea hearing that he had sufficient comprehension of English to communicate with and understand his attorneys.  (Tr. 18:7–14.)  Further, the Court expressly asked Petitioner if he understood that he was at risk of deportation because he was pleading to a felony crime, and he responded "Yes."  (Tr. 26:19–24.)  Thus, in 2006 at his plea allocution, Petitioner directly acknowledged and accepted the fact that he could be deported for pleading guilty.  The record is devoid of any evidence that Petitioner expressed concern or otherwise indicated that he could not understand any aspect of the plea proceedings.

Petitioner cannot now rely on unsupported, self-serving allegations that he did not actually understand the proceedings in 2006 in the hopes of avoiding the imminent consequence

he knew all along was a possibility.  *See United States v. Grzybek,* 283 F. App'x 843, 845 (2d

Cir. 2008) ("It is well established that '[a] criminal defendant's self-inculpatory statements made

under oath at this plea allocution carry a strong presumption of verity . . . and are generally

treated as conclusive in the face of the defendant's later attempt to contradict them.'" (alterations

in original) (citation omitted)); *Marcelin v. Garvin*, No. 97-CV-2996, 1999 WL 977221, *7

(S.D.N.Y. Oct. 26, 1999) ("[S]tatements made at plea allocutions carry a strong presumption of

verity and constitute a formidable barrier in any subsequent collateral proceeding." (citation

omitted)).

Similarly, Petitioner cannot establish that counsel was deficient for not adequately

acknowledging a conflict in representation.  Petitioner now states that he never spoke to counsel

outside the presence of his brother, which prevented him from "explain[ing] how the actions of

[his] brother had been responsible for the circumstances."  (Pet'r's Decl. ¶ 19.)  He also claims to

have no memory of consulting with independent counsel, despite in the same sentence conceding

that "an inquiry was conducted at the time."  (*Id.* ¶ 23.)

When presented with the potential conflict issue, Judge Gershon conducted a thorough

*Curcio* hearing and obtained a valid waiver of conflict from Petitioner and his brother.  The

hearing transcript shows that Petitioner was informed of the potential conflicts and was fully

aware of the risks associated with continuing the joint representation.  (Tr. 4:10–8:17.)

Petitioner articulated to the Court what he believed the possible conflicts were, and nevertheless

chose to proceed with his original attorneys.  (Tr. 10:18–11:11.)  Counsel also clarified for the

Court that they "spent a considerable amount of time explaining to [Petitioner and his brother]

the difference between a potential conflict of interest and an actual conflict of interest" and how

if there were any issues or options "that would have been advisable for either . . . then certainly

[the attorneys] would not have continued as counsel for both of them."  (Tr. 9:3–18, 11:23–12:17.)

At the time, Petitioner understood the purpose of the waiver and the nature of the rights he was giving up.  (Tr. 4:10–8:17.)  There is nothing in the record to suggest that Petitioner was not fully informed prior to the waiver colloquy, particularly because he confirmed that he reviewed his attorney's letter to the Court detailing how Petitioner met with independent counsel and confirming that he wished to proceed with the waiver.  (Tr. 4:10–8:17, 10:18–11:11.)  Petitioner stated that he did consult independent counsel and went on to explain in his own words the nature of the potential conflicts.  (Tr. 10:18–11:11.)  If Petitioner truly did not understand what was happening, the time to raise that concern was during the hearing, prior to waiving the possible conflicts and any related challenges.  Having knowingly and voluntarily given up those rights, Petitioner cannot establish that counsel's performance was deficient simply because he now regrets that decision.

### 2.  Petitioner has not demonstrated prejudice

Although the Court concludes that Petitioner has failed to show that counsel's performance fell below *Strickland*'s "objective standard of reasonableness," *Chaidez*, 568 U.S. at 347 (quoting *Strickland*, 466 U.S. at 687–88), the Court nevertheless addresses whether Petitioner has established prejudice.  *See Grant v. United States*, 725 F. App'x 76, 77 (2d Cir. 2018) ("A court need not address both prongs of the *Strickland* test; if either fails, the entire claim fails.") (citing *Strickland*, 466 U.S. at 697).  He has not done so.

A petitioner facing deportation as a result of a guilty plea can demonstrate prejudice by establishing a "reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Lee v. United States*, 582 U.S. 357, 364–65

(2017) (quoting *Hill*, 474 U.S. at 59).  "Courts should not upset a plea solely because of *post hoc* assertions from a [petitioner] about how he would have pleaded but for his attorney's deficiencies.  Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences."  *Id.* at 369; *see also Rodriguez v. United States*, 730 F. App'x 39, 43 (2d Cir. 2018) ("Lee had lived in the United States for nearly three decades, had established two businesses, and was the only family member in the United States who could care for his elderly parents.  Under the circumstances, this left 'no reason to doubt the paramount importance [the defendant] placed on avoiding deportation." (citations omitted)).  To show prejudice, a petitioner must demonstrate that he "placed particular emphasis on immigration consequences in deciding whether or not to plead guilty."  *Rodriguez*, 730 F. App'x at 43 (quoting *Kovacs*, 744 F.3d at 52); *United States v. Seepersad*, 674 F. App'x 69, 70 (2d Cir. 2017) (same); *see also Whyte v. United States*, Nos. 08-CR-1330, 14-CV-3598, 2015 WL 4660904, *7 (S.D.N.Y. Aug. 6, 2015).  "When a petitioner claims that he would have pursued an affirmative defense but for his lawyer's erroneous advice, 'the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial.'"  *Kovacs*, 744 F.3d at 53 (quoting *Hill*, 474 U.S. at 59).

In addition, the Second Circuit has held that a petitioner can satisfy *Strickland*'s prejudice prong by showing that "there was a reasonable probability that the petitioner could have negotiated a plea that did not impact immigration status or that he would have litigated an available defense."  *Id.* at 52; *see also Rodriguez*, 730 F. App'x at 43.

Petitioner faults his attorneys for failing to explain that he could be deported if he pleaded guilty but does not elaborate beyond, "I never would have accepted the plea" had he known.[5] (Pet'r's Decl. ¶ 21.)  Nor is the Court persuaded by Petitioner's claim that he could have gone to trial and raised the defense of "blaming his brother."[6]  (*Id.*)  Such bare bones allegations are insufficient, particularly without any supporting evidence from the record.  *See Scott v. Superintendent*, No. 03-CV-6383, 2006 WL 3095760, *9 (E.D.N.Y. Oct. 31, 2006) ("[C]onclusory allegations that [a petitioner] would have insisted on proceeding to trial are generally insufficient to establish actual prejudice under *Strickland*."); *Calderon*, 953 F. Supp. 2d at 385 ("[The petitioner] fails to provide any evidence that 'but for' [counsel's] advice, he would have proceeded to trial, other than his own self-serving statements, which are insufficient.").

During the plea hearing, Petitioner affirmed his intent to plead guilty when Judge Gershon informed him of the immigration consequences and there is no indication that he put any emphasis, much less "particular emphasis," on immigration consequences when making that decision.  *See Whyte*, 2015 WL 4660904, at *7; *see also id.* at *10 (discussing *Gonzalez v.*

---

[5]  Petitioner does not attempt to argue – nor could he – that, but for counsel failing to explain that he could be deported, Petitioner could have negotiated a plea that did not impact his immigration status.  *See Kovacs*, 744 F.3d at 52.  Keeping in mind that a criminal defendant has no right to be offered a plea, a petitioner must "demonstrate a reasonable probability that the prosecution would have accepted, and the court would have approved, a deal that had no adverse effect on the petitioner's immigration status."  *Id.* (citing *Missouri v. Frye*, 566 U.S. 134 (2012)).  Petitioner makes no such argument.  (*See generally* Pet'r's Decl.)  The closest he comes is by distinguishing his own felony charge and its immigration consequences from his brother's misdemeanor charge, which carried no such collateral consequence.  However, Petitioner and his brother committed and were charged with different offenses arising from two separate criminal acts.  Thus, even if Petitioner wanted to, he could not rely on the outcome of his brother's case as evidence of a possible alternative outcome for his own.

[6]  According to the government's letter in opposition, had this matter gone to trial, the evidence against Petitioner would have included the testimony of the OSHA compliance officer to whom he directly made the false statement.  (Gov't Opp'n 7.)  By pleading guilty, Petitioner also avoided a maximum sentence of five years of incarceration.  (Tr. 25:15–18.)

*United States*, Nos. 10-CV-5463, Nos. 08-CR-146, 2010 WL 3465603, *1 (S.D.N.Y. Sept 3, 2010)) (finding that, even assuming defense counsel failed to advise on the issue of mandatory removal," petitioner could not show reasonable probability of different outcome where court provided sufficient warning of possible immigration consequences); *Zhang v. United States*, 543 F. Supp. 2d 175, 185 (E.D.N.Y. 2008) ("Even if [plaintiff] had been informed that a conviction for an aggravated felony would result in mandatory deportation, there is no evidence that he would have chosen to proceed to trial.").

 The record also undermines Petitioner's current argument that there was a conflict of interest because the *Curcio* hearing established his knowing and voluntary waiver, which in turn barred him from later complaining about any such conflict. (*See* Tr. 10:17–11:11.) The admissions made by Petitioner at the hearing, including that he met with independent counsel, discussed possible conflicts with his attorneys, and reviewed relevant written correspondence to the Court, along with his own explanation of the conflict to the Court, cannot now be undermined by the conclusory allegations that he did not understand the nature of the proceedings and did not, until recently, fully appreciate the consequences of his decisions.

 Because Petitioner cannot show that counsel was ineffective in any regard, he has failed to present any circumstances which would compel the granting of a writ of error *coram nobis*. *See Calderon*, 953 F. Supp. 2d at 385 (concluding "claim that [petitioner] received the ineffective assistance of counsel is not valid, and therefore there are no circumstances that compel the writ to achieve justice"). The Court therefore denies the petition on its merits.

### 3. No sound reasons for delay in filing

 Petitioner has further failed to justify the thirteen-year gap between when he initially pled guilty and when he first raised claims of plea counsel's ineffectiveness. "A petition for writ of

*coram nobis* may be 'time barred if the petitioner cannot provide a justified reason for failure to seek appropriate relief at an earlier date.'" *Thomas v. United States*, No. 19-CV-5675, 2020 WL 3428148, *6 (S.D.N.Y. June 23, 2020) (quoting *United States v. Hernandez*, 283 F. Supp. 3d 144, 153 (S.D.N.Y. 2018)). "While '[n]o statute of limitations governs the filing of a *coram nobis* petition,' a petitioner must still show 'sound reasons' for the delay in bringing the petition." *Doe v. United States*, 915 F.3d 905, 915 (2d Cir. 2019) (first quoting *Kovacs*, 744 F.3d at 54; then quoting *Foont*, 93 F.3d at 79). Courts are required to address the timeliness inquiry on a case-by-case basis, with the critical question being "whether the petitioner *knew or should have known earlier* of facts underlying the claim for *coram nobis* relief." *Thomas*, 2020 WL 3428148 at *6 (emphasis added) (quoting *Hernandez*, 283 F. Supp. 3d at 153); *see also Evangelista v. United States*, No. 11-CV-5085, 2012 WL 3818109, *3 (E.D.N.Y. Sept. 4, 2012), *aff'd*, 523 F. App'x 12 (2d Cir. 2013). Where the filing of a petition has been delayed by several years and the petitioner has not proffered sound reasons for such delay, the petition should be dismissed. *Compare Foont*, 93 F.3d at 80 (dismissing petition as untimely where petitioner failed to explain why he waited five years to file *coram nobis* petition when he was aware of facts underlying claim at time of conviction) *and Echendu v. United States*, No. 02-CV-1255, 2003 WL 21653370, at *7 (E.D.N.Y. July 14, 2003) (acknowledging that petitioner had no reason to file petition prior to change in immigration law, yet still finding no justification as to why petitioner waited an additional five years to raise claims), *with Dixon v. United States*, No. 14-CV-460, 2015 WL 851794, at *8 (S.D.N.Y. 2015) (finding that petitioner offered "sound reasons" for his failure to file earlier where he reasonably believed he could not file until being released from prison, and where he otherwise demonstrated a diligent effort in pursuing his claims) *and Medina v. United States*, No.12-CV-238, 2012 WL 742076, at *2 (S.D.N.Y. Feb. 21,

2012) (finding petition timely where petitioner filed approximately two years after becoming aware of the immigration consequences of his conviction).

The sufficiency of the reasons bears an inverse relationship to the length of the delay — the longer the delay, the more compelling the reasons must be. *Compare Hairston v. United States*, No. 99-CV-739, 1999 WL 1288967, *2 (E.D.N.Y. Nov. 1, 1999) (denying petition brought twenty-two years after sentencing and rejecting as reasons the court's failure to advise petitioner of rights to appeal and to appointment of counsel for appeal as well as petitioner's memory loss); *Graham v. Lamar,* No. 97-CV-2386, 1998 WL 960297, *2 (E.D.N.Y. Dec. 16, 1998) (denying petition brought twenty-two years after sentencing where reasons offered included petitioner's ignorance of his rights to appeal and to counsel's and petitioner's drug addiction), *with United States v. Ko,* No. 93-CR-521, 1999 WL 1216730, *4 (S.D.N.Y. Dec. 20, 1999) (granting writ brought approximately three years after sentencing where reasons for delay included changes in the immigration law and pendency of and delays in deportation proceedings).

Petitioner's January 2020 *coram nobis* petition was filed thirteen years after his guilty plea and almost eight years after the initiation of removal proceedings. As the government argues, Petitioner "has not provided any explanation for his delay in seeking [*coram nobis*] relief let alone 'sound reasons' for the delay in filing." (Gov't Opp'n 3.) Petitioner's only justification for the delay is that his immigration counsel did not advise him until mid-2019 that it would be necessary for him to collaterally challenge his conviction in the hopes of vacating the conviction, even though removal proceedings began in 2012. (Pet'r's Decl. ¶¶ 34–35; Pet'r's Mem. 1.) *See e.g.*, *Ragbir v. United States*, 950 F.3d 54, 63 (3d Cir. 2020) ("A [petitioner] seeking to avoid the collateral consequences of a conviction cannot postpone seeking relief until it appears that a

22

collateral consequence is imminent."). Even if Petitioner was not previously aware of the writ of error *coram nobis* as a possible avenue for relief, he still fails to explain why he did not attempt to raise his concerns or withdraw his guilty plea where the record indicates that he was aware *at the time of the plea* that he was both subject to immigration consequences *and* had knowingly waived his right to challenge any claim arising from possible conflict in representation. *See Foont*, 93 F.3d at 80 (finding that "Foont knew or should have known since the time of his conviction in 1990 of the facts underlying his current claim"). Accordingly, the Court finds that Petitioner has failed to satisfy the second prong for *coram nobis* relief, and the Court denies the petition on this ground as well.

### III. Conclusion

For the reasons stated above, the Court denies the *coram nobis* petition.

Dated: September 6, 2023
Brooklyn, New York

SO ORDERED:

\_\_\_\_/s/ MKB_____
MARGO K. BRODIE
United States District Judge

23